Good morning, Your Honors, and may it please the Court, my name is Greg Mack, Counsel for the Respondents. I have with me today Assistant U.S. Attorney Christopher Pickerell, but all of the argument time will be presented by myself, and I would like to reserve three minutes of rebuttal time. Okay. Your Honors, in this case, Congress has concluded that the prompt removal of aliens upon the entry of an administratively final order of removal is essential to the effective operation of the nation's immigration laws. Toward that end, Congress specified in 8 U.S.C. Section 1231b-2 the steps that are available to the Executive Branch in removing an alien from the United States. Specifically, it authorized the removal of an alien to his country of birth without qualification. In addition, Congress barred in 8 U.S.C. Section 1252f-1 the ability for district courts or the courts of appeals to grant class-wide injunctive relief against the operation or enforcement of 8 U.S.C. Section 1231b-2. In addition, there are threshold jurisdictional questions that are presented in this case, including whether the petitioner's appellees exhausted their administrative and judicial remedies, and whether the district court even had habeas jurisdiction to begin with. For all these reasons, this Court should reverse the district court's erroneous conclusions that the Executive Branch's decision or action to remove aliens to Somalia is contingent upon the Executive Branch's obtaining acceptance of the aliens' repatriation from the government of the receiving country, and that a class action that is nationwide in scope and designates the Attorney General and the Commissioner of the INS an entity or individual that doesn't actually exist anymore. As custodians' respondents, it is an appropriate litigation tactic in this case, especially where the aliens have failed to exhaust their administrative remedies in this particular case. And with respect to exhaustion of administrative remedies, we point the Court to 8 U.S.C. Section 1252d-1 that says that before aliens may challenge their removal proceedings, and we contend that the removal to Somalia is part and parcel of an order of removal, they must exhaust their administrative remedies. And that is backed up as well by the Sundar decision from the 11th Circuit, as well as this Circuit's own jurisprudence in the Castro-Cortez case that says for prudential reasons, before a habeas petition may be filed, aliens should exhaust their administrative remedies. In this case, we have at least three aliens who did not challenge their immigration orders from an immigration judge before the Board of Immigration Appeals, certainly didn't file petitions for review, and one alien couldn't even be bothered to show up for his removal proceedings, and yet they seek the extraordinary relief of habeas in this case before even exhausting a complex question implicating foreign policy issues to the Board of Immigration Appeals and on into a petition for review before this Court. They're not disputing the fact that they're subject to removal, as I understand it. Well, Your Honor, it's our contention that they are disputing their order of removal because They're disputing that they can be removed to Somalia. And their order of removal says that they shall be removed to Somalia, that is part and parcel of their order of removal. They should have exhausted that issue through the Board of Immigration Appeals and there on into this Court through a petition for review. And the petitioner-athletes have cited to El Riscate to suggest that the exhaustion principle can be avoided. But El Riscate looks to Montez v. Thornburgh, which says that so long as the relief that they're seeking is not inconsistent with the deportation order, you don't have to adhere to the exhaustion principles. But Montez v. Thornburgh, again, what they're seeking here is inconsistent with the orders of removal because they're saying we can't be removed to Somalia. And again, it's our submission that saying that you can't be removed to Somalia without acceptance from that country is part and parcel of their order of removal. At what point in this removal proceeding, from the beginning to now, at what point did the government designate Somalia as the place of removal? It would have been designated in their immigration proceedings. It was also pointed out to me. I don't want to say would have. When? Do you know when Somalia was designated? It was designated in their notice to appear, Your Honor, that they were natives and citizens of Somalia and that they would be removed to Somalia. To Somalia? To Somalia, Your Honor, because they were natives and citizens of Somalia. So they're put on notice that Somalia, through the statute, the operation of the statute, section 1231B2E4, that Somalia is a potential country for removal. So they're put on notice through their notice to appear, as well as their order from the immigration judge that they shall be removed to Somalia. Now, in this case, however, the immigration court proceedings were not prescribed or transcribed because there was no appeal to the Board of Immigration Appeals, where there is ordinarily a transcription of the record of proceedings before the immigration judge. And typically, when there is proceedings before the immigration judge, one of the first things the immigration judge does is designates the country of removal. However, we don't have that record here because, again, they failed to exhaust their administrative remedies to the Board of Immigration Appeals. We've also pointed out to the district court and to this court that it was aired for the district court. Let me ask. Would it have been futile for them to even raise this issue? Not at all, Your Honor, because the Board of Immigration Appeals had resolved the question of the country of removal and acceptance in matter of Lennis, as well as matter of Measel. And the Second Circuit decision in Dougherty v. Thornburg had said that Dougherty had gone through the process of exhausting the question before the Board of Immigration Appeals. And the district court aired in that regard, Your Honor, by pointing out that it would be futile for the aliens to take this issue to the Board of Immigration Appeals because the district court said the agency had already made up its mind, pointing to the INS. But it's not the INS that would have been considering the question. It would have been the Board of Immigration Appeals, an entity separate and apart at that time from the INS. And even now, today, the Board of Immigration Appeals is in a completely separate department from the legacy INS because, of course, INS now is in the Department of Homeland Security. So it wouldn't have been futile. It wouldn't have been the case that the INS had already made up its mind. The INS and the aliens here would have been on separate sides of the issue before the Board of Immigration Appeals. The Board of Immigration Appeals had considered this issue in matter of Lennis and matter of Measel and certainly was capable of resolving this issue. The Board of Immigration Appeals is not in the Department of Homeland Security. It is not, Your Honor. It is still under the Department of Justice under the Attorney General, Your Honor. But again, our point there was the district reporting to the INS has already made its mind. So therefore, it would have been futile for them to exhaust their administrative remedies. But in this case, we submit the Board of Immigration Appeals was the entity that would have adjudicated the question of whether acceptance was required and had indeed done so. What is your understanding of what the Board's position was at that time? Well, Your Honor, I couldn't say how the Board of Immigration Appeals would have ruled. They certainly had Measel and they certainly had Lennis before them. Lennis was decided in the Second Circuit and the Board has a policy under matter of KVD of intra-circuit acquiescence. So Lennis arising in the Second Circuit, they had to apply circuit law there and they had Tom Mann to deal with. But we would submit that the Board would have a new statute, different than the statute considered in Tom Mann. I certainly can't speak to what the Board of Immigration Appeals would have resolved. That's the whole point is that I represent essentially the Immigration Enforcement Authorities. I don't really represent the Board of Immigration Appeals because the government, the executive branch, acts as a prosecutor, if you will, a litigant, a party before the Board of Immigration Appeals. And so therefore, the appellees in this case should have exhausted their administrative remedies. And certainly one of the aliens should have just showed up for his removal proceedings rather than seeking the extraordinary relief. And as this Court pointed out in Castro-Cortez, a prudential exhaustion principle is that before seeking habeas, they should exhaust their administrative and judicial remedies. And with respect to the exhaustion of their judicial remedies, we would submit that Section 1252G suggests that the district court did not even have habeas jurisdiction of this case to begin with. And that is not to say that habeas has been repealed. That is to say that rather Congress said that decisions or questions of this kind should be channeled to the courts of appeals via a petition for review. And of course, this Court has Magano-Pisano and Flores-Miramontes that says that, look, habeas is available in the district court, so we don't need to foreclose or consider these questions under 1252G. But Magano-Pisano and Flores-Miramontes are petitions for review, petitions for review raising questions wholly outside of 1252G. 1252G deals with questions regarding decisions or actions to execute an order of removal. Magano-Pisano and Flores-Miramontes do not deal with that. And it's the government's submission that this Court should resolve in a habeas petition the question of whether 1252G says you need to channel your cases to the courts of appeals via a petition for review or whether habeas is available and you can bypass or essentially ignore 1252G. Again, it's our position that St. Cyr notwithstanding, because St. Cyr did not address Section 1252G, but this Court, the Court of Appeals, the entity or body that Congress said should resolve questions dealing with the decisions or actions to execute a removal order, this Court should resolve that question. The appellees here should have presented this question to this Court of Appeals here. And if the Court of Appeals had argued the case and the Court of Appeals said no, habeas is available, then they take their case on into the habeas, into the district court, rather than in the first instance ignoring Section 1252G, ignoring the exhaustion principle and stepping right into the district court on a habeas petition. Sotomayor It's called 1252G. It doesn't express this. It doesn't say anything about habeas. It does not say anything at all about habeas, Your Honor. And St. Cyr certainly says if it doesn't exclude habeas explicitly because of the Felker doctrine, we're not going to presume that habeas has been repealed. But our point there is not that habeas has been repealed, but that Congress has channeled review into the courts of appeals. And Felker, after all, explicitly mentioned or said that we don't have jurisdiction, we do have jurisdiction, we just shouldn't exercise it. Elwood You have jurisdiction insofar as considering the question under 1252G on direct review via petition for review, and that cases of this sort, challenging the decision or action to execute a removal of the court of appeals. Sotomayor I was referring to habeas. Elwood Oh, there is. There should not be any review under habeas because Congress has said these questions should be channeled to the courts of appeals via the petition for review, and that should not be a disoption. But at least let this Court resolve the question under 1252G. Roberts We should limit St. Cyr just to its particular circumstance. Elwood Correct. And again, St. Cyr and Magano-Pisano and Flores-Miriamontes are all cases dealing with questions outside of 1252G. This case squarely presents the question of what – whether a decision or action to execute a removal order should be heard in habeas or heard in courts of appeals. And this Court should decide for itself first whether 1252G-type questions should be heard here on direct review via petition for review, or whether aliens can bypass it and go directly to the habeas district court. Because, again, after all, St. Cyr is not explicitly dealt with – doesn't explicitly deal with section 1252G, Your Honor. And let me turn for a moment, if I will, if I may, to the – to the class certification points here, Your Honor. We believe the district court erred in that regard because it just simply ignored the congressional command in section 1252F1. It essentially points out that regardless of the nature of the claim, no district court can hear a question in result regarding the operational enforcement of a case falling within sections 1221 through 1231, Your Honor. And that's essentially what this district court did. It ignored it by saying, look, these are constitutional claims that are raised here, pointing to decisions – district court decision Grimaldo and Tefel. Now, the government pointed out that Van Dien v. Reno, decided by the Tenth Circuit, said that 1252F1 means that the Supreme Court is the only entity to consider class-wide injunctive relief against the operational enforcement of statutes such as the statute in question here, 1231B2E4. The district court pointed to Grimaldo. Van Dien, however, is a case decided by the Tenth Circuit after Grimaldo. Grimaldo is a district court of New Mexico – New Mexico case and, therefore, falls within the Tenth Circuit. So it was air for the district court to rely on Grimaldo in that regard when we pointed to Van Dien. So Van Dien trumps or overrules Grimaldo in that regard. So all that's left for the district court to stand on here is the Tefel v. Reno decision, which gives very scant analysis to the question of whether a constitutional claim allows one to skirt 1252F1. And we would submit that, regardless of whether it's a constitutional or statutory question, all claims involving the operational enforcement that present class-wide injunctive relief claims against Section 1231B2 have to be presented in the first instance to the Supreme Court. Now, if the Supreme Court decides for prudential reasons it wants a district court to take fact-finding in that regard, that's one thing. It's quite another thing for Petitioners to go directly into district court and for the district court to ignore the clear congressional command that's found in 1252F1. Let me see if I understand your argument. So if there were no class action allegations here, no class-wide relief sought, then 1252F1 wouldn't be a problem? It wouldn't be. It wouldn't be. It wouldn't need to be applied because there's no class-wide claims here, particularly and especially no nationwide class-wide claims here. 1252F1, as I understand it, explicitly bars class-wide relief claims except in the Supreme Court. And that's exactly what transpired here. And Congress has been explicit about why 1252F1 is on the books. It's on the books because it doesn't want a single district court or a single court of appeals to enjoin the government's action with respect to a question that is essential to the operation and enforcement of immigration laws, particularly one dealing with removal of aliens from the United States. So Congress has been explicit in that regard. The district court erred in looking to Grimaldo because it was overruled by Van Dihn. And then, again, all that's left is the Tefl decision that relies on this principle that constitutional violations take you outside of 1251 — excuse me, 1252F1. Now, let me also point out, however, that Petitioner at Palais here skewed that they were asserting constitutional claims here. They said that we're not presenting constitutional claims. So if we're — so if Tefl — They want to seek to compel the government, DINS, to properly enforce, to properly apply statute. As I understand it, presenting a statutory question, not a constitutional claim, as I understand it. But Tefl goes off on a constitutional claim, saying constitutional claims fall outside the scope of 1252F1. So that's the case. And if Petitioner at Palais are skewing that they have constitutional claims here,  are inside 1252F1, and 1252F1's bar would apply, Your Honors. And this — Before your time runs out, I mean, would you address the merits of the whole of the case? Certainly, Your Honor. With respect to the merits, Your Honor, I think that the Eighth Circuit has presented the question quite — quite clearly. In JAMA, the Eighth Circuit's decision, this is where the case started in the nation, with the JAMA case in the district court. And JAMA essentially says, the plain language of the statute, you can't build acceptance into this statute. It's simply not there. You may try to employ certain statutory interpretation principles, but the plain language of the statute does not include acceptance in the fourth option in this third step of 1231B2. It's simply not there. The government may remove aliens to their country of birth without qualification. And with respect to Somalia, that's what's going on here. The government proposes — How does — I mean, just — just practically. I mean, whether you just take them there and drop them off, is that what happens? What happens is, Your Honor — I'm just curious. What happens is, Your Honor, and we pointed out in the Venturella declarations, that aliens are taken from the United States by commercial flight or by charter, depending on the number of aliens that are involved. And they're removed to a third transit country and then flown into Somalia, flown primarily mostly into Mogadishu. And they're dropped off. That is removed — that is removal for the purposes of the United States. And this statute says — But you have done this. The government has done this. The government has done that, and we pointed that out — In the standard of the country. That's correct, Your Honor. With respect to Somalia, we pointed out in the Venturella declaration that we have removed aliens to Somalia without getting acceptance from Somalia. We have landed planes into Somalia and removed aliens under this practice. Drop them off. Drop them off into Somalia. Yes, Your Honor. Do you have any idea of how big this class is? The plaintiff's class? At the time we were before the district courts, Your Honor, the class of aliens was approximately 2,700. As you can imagine, with ongoing removal proceedings, that class would grow over time. So roughly — It depends on how many people you've already removed? Well, we're under the district court's injunction not to remove now. It's a nationwide injunction, of course. But at the time we were before the district court, the class is roughly 2,700 aliens overall, with approximately 41 aliens in detention and available for immediate removal. But again, it's our belief that the JAMA decision is on all fours with this, and this Court should follow the JAMA decision. You simply cannot build acceptance into this third option here. It simply isn't there. The plain language of the statute supports the government's position that you can remove aliens to their country of birth without gaining acceptance from the receiving country, Your Honors. And with that, Your Honors, I will reserve the balance of my time for rebuttal. That's fine. Thank you, Mr. Maddox. Thank you. Please, the Court. Nick Gellert, the Perkins Coie firm. On behalf of the Petitioners with me at table, Carol Brown and Ralph Johnson, also Perkins firm. Before the Eighth Circuit issued its decision in JAMA a few weeks ago, every court to look at the question has disagreed with the government's position in this case. Since then, the Eastern District of Louisiana in the Muhammad case, brought to your attention in the 28-J letter of Counsel Mr. Mack earlier last week, issued a ruling following JAMA. Also of note, in the Southern District of Texas, in a case called Abdulrahman, issued a decision a couple weeks ago in a case involving an Ethiopian where Ethiopia had declined to give acceptance, but the court said even though government there had declined acceptance because the person was born there, the government's interpretation of the statute allowed removal to Ethiopia. I'm not clear on the status here. What circuit courts have held, as the district court did in this case, since 1996-1231 passage? Only the JAMA decision since 1996. Prior to 1996, several circuits had ruled. I find a lot of difference between the statutes before and after 1996. So at least on the current version of that law, there's only one opinion. That's the Eighth Circuit. That's correct, Your Honor. With respect to the differences in the statute, with all due respect, we would submit that the statutes have no substantive difference. First of all, Congress, in enacting, in the legislative history, in enacting the new statute, stated that they were really only restating the prior statute. Furthermore, when Congress passed the 1231B, they were aware of, or should be assumed to be aware of the uniform interpretation of the prior statute and should be understood to have accepted that interpretation unless they were stated clearly in disagreement with it. As far as the structure of the statutes, both statutes have numerical subsections, one through seven. In the prior statute, it was regular numbers. In the current statutes, Roman numbers. But they both had subclauses in the same respect. The only major difference, or the only difference, and I would submit it makes no substantive difference, is the replacement of semicolons with periods. The JAMA decision, with all due respect, is erroneous for several reasons. JAMA relied on the presumption that, or the statement that the clauses within 1231B2E, the third step, are all, quote, self-contained. With all due respect, they're not self-contained. The individual subclauses, standing alone, are nonsensical. They're incomplete sentences. Instead, they, to use the Eighth Circuit's phrase, the syntax and geometry of 1231B2E requires that the entire provision, including the introductory clause all the way through the end of subclause seven, must be read together. Furthermore, subsection seven's use of the word another country whose government will accept, that use of the word another brings, is referencing back to the prior countries. And the introductory clause of section seven, the clause about impracticability and impossibility specifically references the prior subsections and thus require that the entirety be read together. As I said, prior to JAMA ---- Kagan. You know, if you look at the literal text of the statute, or the face of the statute, as the government would have us do, the government's argument is not completely ridiculous. Well, I'm not saying it's ridiculous, but ---- Well, I guess without ---- And the Eighth Circuit thought that there was some merit to it. Correct. But the Eighth Circuit, as I said, relied on the assumption that or the statement that the individual subclauses could stand alone. Right. And they don't stand alone. They're introduced by the introductory clause. Let me ask you this. Let me be more direct. Is there any other reason? Why shouldn't, you know, we're not bound by what the Eighth Circuit says. Sure. And, you know, but if it's persuasive, you know, we've got to give it some consideration. Right? In fact, we may even follow it. Sometimes they say we join our sister circuits. Other than what you just said here about the introductory clause and whatnot, what other reasons? Why shouldn't we follow the Eighth Circuit? Well, several, Your Honor. One being that other portions of the same statute, for instance, 1231A7, which would deal with authorization to give work papers, states, quote, the alien cannot be removed to the refusal due to can only be work papers can only be given if, quote, the alien cannot be removed due to refusal of all countries under this section to receive the alien. Referencing Congress's understanding that acceptance was required with respect to all of the sections of the statute. And that congressional understanding makes sense in terms of, as I said, the uniform interpretation of the prior statute, 1253A, beginning with the HUDAC decision from New York in 1937 all the way through the Tom Mann decision in 1959, the D.C. Circuit in the 60s, the First Circuit in the 1980s. Furthermore, the INS's own regulations and operating instructions recognize the INS understood that tribal papers were required before it removed any alien. And the board's interpretation in a case that's actually not in the briefs, it's called the Matter of Annunciation, 1968, EIA, Lexus 88. The EIA said, quote, obviously the United States cannot deport an alien to a country which will not accept her. And we agree with that. And counsel has asked, well, what would the board have done? Niesel and Linus did not involve the question before the Court here. It involved the question of what is a country for purposes of designation. It did not – it was not in a situation where there was a final order of removal, and the question is can that order of removal be implemented because there wasn't acceptance. On the other hand, in Linus, the Court, and counsel refers to it as dicta in their brief, gave their understanding of what that statute required when ultimate removal did occur post-finality of the order of removal. And as your question earlier indicated, we are not challenging the order of removal. We concede that the order of removal is appropriate for purposes of this litigation, and we're not challenged that Somalia wasn't a country that could be designated. The petitioners were or are nationals and citizens and were born in Somalia. But we contest that once the final order of removal became final, it cannot be now challenged or it can now be challenged if the attorney general violates the statute. With respect to some of the procedural issues or the jurisdictional issues, I think it's of note that counsel, with reference to 1252F1, kept saying instead of operation, operation and enforcement. The statute only uses the word operation. We are not challenging the operation of 1231B. We're making a challenge to requiring that be enforced, that the attorney general's authority not overstep what Congress granted the attorney general. Another reason that the JAMA decision should not be followed is that it would result in using another canon of statutory construction. It would make certain provisions superfluous. In particular, it would make Step 2 of the statute, with respect to requiring the attorney general to first remove to the country of nationality, superfluous under the circumstances here where, as I said, the clients, our clients were born nationals of and born in the same country. The JAMA decision tries to justify that it's not superfluous by saying that there could be circumstances where the country of birth is different from the country of nationality. I'd point out, first of all, that's not the facts of this case. But, second, that in its brief, its brief at 34, the government concedes in discussing subsection 7 of the third step, that the less the connection between an alien and the country, the greater the need for acceptance. So if it is, in fact, the case where you are a national of a different country from where you were born, all the more reason that Congress would have expect or required acceptance from where you were born and not a national, because you have obviously more connection to the place you are a national and citizen than where you happen to have been born but are no longer a citizen. The other justification that the JAMA decision offered for why the statute doesn't create, make the second step superfluous is that Congress could have just said, well, ask. They're only requiring that you ask politely first, and then you can go ahead and drop people in a country having your request, your polite request denied. First of all, I don't know what's polite about such a request. If the country knows that its will is going to be overridden when it says, no, we won't accept the alien. But if that's what Congress intended, you would have expected to say it more directly than the supposition here that they sort of implied it. Furthermore, if that's what they intended, you would expect in the third step, you would be able to remove to the country that you asked, the country of nationality and citizenship. But that is not one of the seven criteria. So it doesn't make sense that you would ask the country of birth in a country of nationality politely. And then when they say no, you drop the alien in some other country under the JAMA's explanation. Ultimately, the government argues that our interpretation makes the subsection four of the third step itself superfluous. The government argues in its reply brief at 10, quote, it is section four that is rendered innocuous, meaningless, and superfluous by the district court's statutory analysis because it leaves under the district court's erroneous interpretation the government with no removal option in the unique case of Somalia. First of all, there is – it's not – we're not making the argument that there's no – or leaving the government with no removal option for Somalia. We're just saying you can't remove the aliens to Somalia under the current state of affairs. There's news reports just currently that the situation in Somalia may be about to change. There was a meeting this weekend with respect to trying to create a new government in Somalia. We are just saying that while the current situation is present, you can't remove. And I guess I would take issue with the government's suggestion that this case is necessarily unique to Somalia. As I said at the beginning, they're now taking the same position with respect to Ethiopia, which does have a recognized government, a government that said no, and the government's position is we can send the alien your way anyway. In the short time I've left, I'd like to talk a little bit about the class action issues. The government doesn't challenge the underlying principles that support the district court's judgment that class action was appropriate here. They don't challenge numerosity. They don't challenge that our clients are adequate representatives for a class or that they raise issues of typicality. In fact, I think it's conceded that all of the aliens in the class are subject to the same pure issue of law that affects them all, and if the court disagrees with our view and agrees with JAMA, that they're all subject to removals under the same grounds. The government's principal argument, other than the jurisdictional arguments already discussed, by counsel is that the attorney general and the commissioner of the INS were not proper custodians. The normal rule, of course, is that in the criminal context that you look to the warden of the jail in which the alien resides as the custodian for purposes of habeas, but the courts have recognized that there may be exceptions in the exceptional circumstances, and we would submit that this is an exceptional circumstance. There's 2,700 individuals around the country, and we don't know who they are. We don't know where they are, and we don't know who their, quote, immediate custodian, unquote, is. We only know that they're at risk of removal to Somalia if the order to prevent violation of statute is not entered on a class-wide basis, and they're all affected by the same pure issue of law, and the class action is the only means of protecting them. Furthermore, and I don't believe that the attorney general has the ultimate, or is it the commissioner that has the ultimate say here? The statute gives the authority to the attorney general. So, and which is a reason in that the immigration context is different than the normal criminal case because the statute says the attorney general shall do this, the attorney general shall do that. It's not like, you know, in the normal criminal context where it's the state and the warden is the one holding you. Here it is the attorney general who has the authority, and the record shows that the attorney general was exercising authority to consolidate the detention functions at a national level, that the removal of Somalians to Somalia necessarily was a coordinated effort. It required flying people from various portions of the country to a place where a chartered flight could be sent such that they could get to another place where an airplane could fly them into some airstrip in Mogadishu and be left. So there's no question we would submit that there's a national effort here and that the only effective way to deal with that is on a national scope. I'd also like to point out, because I don't think it's really set up in the briefs, that we are not only seeking class relief under the habeas statute, but as well under we're also seeking declaratory relief under general federal question jurisdiction. 1252G only prevents the court from exercising jurisdiction over certain discretionary decisions. And as I said at the beginning, we're not challenging a discretionary decision of the attorney general. Instead, we are saying that the attorney general wasn't given the authority to do what he's doing here. So 1252G is not a bar to either declaratory judgment relief or habeas relief. But even if it could be viewed as a bar to the type of relief we're seeking, it doesn't expressly bar habeas relief. And even if it's applicable to the type of challenge going on here, it doesn't prevent habeas relief. Similarly, 1252D, dealing with exhaustion, is inapplicable here. 1252D says a court may review a final order of removal only if we are not challenging or asking for review of the final order. As I said, we concede that the final order is binding, but we're challenging the removal as violating 1231B after the finality of the order. The Supreme Court said in Hensley, our recent decisions have reasoned from the premise that habeas corpus is a – is not a static, narrow, formalistic remedy, but one which must retain the ability to cut through barriers of form and procedural mazes. The very nature of the writ demands that be administered with the initiative and flexibility essential to ensure that miscarriages of justice within its reach are surfaced and corrected. We would submit that that's exactly what we're asking for here, that an injustice be stopped. Any questions? I'll complete my remarks. Thank you very much. Thank you, Your Honor. Rebuttal. Just briefly, Your Honor, as counsel for the petitioner, I'm pleased to note that the statutes here have no substantive difference. Well, they do have substantive difference. After Tom Mann and before Irira in 1996, the Supreme Court held in Rosello that the disparate inclusion and exclusion of a term has meaning and that Congress, with respect to Irira, was legislating within that context. And so that even in the Second Circuit, after the Rosello decision by the Supreme Court, we would submit that Tom Mann is no longer good law because Tom Mann didn't adhere to that principle, that where Congress includes a term in one part of a subparagraph but excludes it in other parts of the subparagraph, that that difference, that inclusion and exclusion has some meaning. So therefore, with respect to Irira in 1996 and the Rosello decision from the Supreme Court, these are substantively different statutes as the JAMA Court in the Eighth Circuit decided. With respect to the issue of the INS regulation and the INS operating instruction, the INS regulation that the district court pointed to dealt with the detention of aliens and the whole aftermath of Zavidas. And of course, Zavidas raises the point where the government isn't giving the United States the opportunity to remove the alien, then you have to consider the custody decision there. With respect to the operating instruction, it's Title 243, which tracks INA Section 243, which tracks 8 U.S.C. Section 1253. Here, there's an entirely new statute, 1231. In addition, 243 we would submit has been repealed by Irira in 1996, and that operating instruction was never published by the INS, so it can't be enforced against the United States. With respect to the Attorney General and the Commissioner of the INS, the habeas statute says, and this Court in Brittingham says, you cannot, you must name the immediate custodian. And finally, what this case is all about, and that the Eighth Circuit has confirmed, is there shouldn't be a de facto veto power to the United States' removal authority simply because there's no central government in a receiving country. Thank you, Your Honor. All right. Thank you, Mr. Mack. We thank both counsel. This case is now submitted for decision. The panel stands in adjournment at this time. All rise.
judges: Reavley , Tashima, Paez